ALBERT S. WOODMAN *vs.* DANIEL CARTER, and others;

PORTLAND COOPERAGE COMPANY, Trustee.

Cumberland.   Opinion May 26, 1897.

*Trustee Process.   Negotiable Note.   R. S., c. 86, § 55.*

The provision of R. S., c. 86, § 55, that no person shall be adjudged trustee by reason of any negotiable note made by him, does not apply to a case where the note is effectually controlled by its maker and is divested of its negotiability by depositing it in the hands of a third party under a written agreement of the parties and to be thus held until notified that a contract for the sale of lumber between the parties has been complied with; and it further appears from the facts and circumstances that the note was not intended, and did not operate, as payment of any definite amount of lumber.

ON REPORT.

This was a trustee suit tried before the justice of the Superior Court, Cumberland county, and by agreement of parties the liability of the trustee was reported for the determination of the law court.

The case appears in the opinion.

*A. S. Woodman and John H. Hill*, for plaintiff.

*A. F. Moulton; F. C. Payson and H. R. Virgin*, for trustee.

SITTING: PETERS, C. J., WALTON, EMERY, WHITEHOUSE, STROUT, JJ.

WHITEHOUSE, J.    This is an action on certain promissory notes aggregating $825, brought by the plaintiff against Daniel Carter, James L. Carter, W. A. Carter and O. H. Carter, of Scarboro, as principal defendants, and the Portland Cooperage Company, trustee.    The writ was served on the trustee June 21, 1895. October 18, 1895, Daniel Carter and James L. Carter filed their petition in insolvency, and John Howard Hill, assignee of James L. and W. F. Dresser, assignee of Daniel, duly appeared to prosecute by leave of court.

The case comes to the law court on report from the Superior Court, and the only question to be determined is whether the Cooperage Company shall be held as trustee of Daniel and James L. Carter, by reason of the purchase of a quantity of lumber from them prior to the service of the writ.    It is stipulated in the report, however, that the alleged trustee shall not in any event be chargeable for more than 50,318 feet of boards at nine dollars per thousand.

The principal facts essential to the decision of this question are found in the statement contained in the amended disclosure of the trustee as follows:

" On May 3rd, 1895, we agreed to take of said Daniel Carter and James L. Carter an indefinite quantity of white pine boards, sawed or to be sawed by them during the season of 1894–5, if the quality was suitable for our business, the amount to be not less than fifty thousand (50,000) feet in any case, and if the boards were satisfactory and the needs of our business required it, perhaps the entire quantity which they would cut at their mill during said season of 1894–5; the boards were, when suitably dried, to be delivered by said Carters during the summer of 1895, at our mill in Portland, and payment was to be made upon or after said delivery.    On May 10, 1895, upon the statement of said Carters that they needed money with which to pay their help, we advanced them one hundred ($100) dollars on account of said agreement.

"On June 17, A. D. 1895, believing from statements made to us by the attorney for said Carters, that said Carters were neither insolvent, nor in contemplation of insolvency, in pursuance of said agreement, and to protect ourselves on said advancement, we purchased of said Daniel Carter and James L. Carter about one hundred thousand (100,000) feet of said boards, and in addition to said sum of one hundred ($100.) dollars, gave them in payment therefor, our negotiable promissory note for one thousand ($1000.) dollars, payable to their order on demand. At the time of this purchase, the boards bought by us were a part of a large lot of boards said to contain about two hundred and fifty thousand (250,000) feet then being at and about the mill of said Carters at Scarboro, and in order to get the boards purchased by us, we took from said Carters a bill of sale of the entire lot and sent our foreman to take possession of the same.

"At the time of this purchase the treasurer and manager of our company was absent in Philadelphia, and from the best knowledge we had of the needs of our business without his advice, we expected to require about one hundred thousand (100,000) feet of the boards; but it was agreed between said Carters and ourselves that, if we should find that our business required a less amount, we could return to said Carters whatever of the one hundred thousand (100,000) feet, above fifty thousand (50,000) feet of the boards; we did not require having credit therefor upon said note. Said foreman went to Scarboro on June 17, viewed and walked over the entire lot of boards, and told the Carters he took possession of them under the bill of sale, and then came away leaving the boards where they were, putting no keeper in charge of them, and doing nothing further to retain possession of them.

"The said Carters were, by the terms of the purchase, to deliver at our mill in Portland the one hundred thousand (100,000) feet of boards more or less, paid for by us and as security for this agreement on their part the note given by us to said Carters in payment for said boards, was, by agreement between said Carters and ourselves, deposited with Charles O. Bancroft, cashier of the Merchants' National Bank of this city, to be held by him until we had

notified him that said Carters had delivered the boards at our mill as aforesaid.

"After said Carters had, in pursuance of said agreement, delivered at our mill fifty thousand three hundred and eighteen (50,318) feet of said boards, we found that we did not need the balance of the one hundred thousand (100,000) feet more or less, bought by us, and by agreement with said Carters, surrendered said balance to them and said Carters gave us an order on Mr. Bancroft for the note which had been fully settled, and the same was delivered to us by him and destroyed. Payment of the note was partly by money payments made to said Carters by us, and partly by boards surrendered to said Carters as aforesaid. Prior to the service of the writ in this case, we notified A. S. Woodman, then attorney for the plaintiffs, that we had purchased of said Carters a certain portion of boards at and about their mill at Scarboro, but had not purchased and did not claim the entire lot."

It appears, however, from the testimony of the president of the Cooperage Company, that the manager of that company was in the habit of making a record of agreements for the purchase of lumber, and that the memorandum of the transaction with the Carters dated May 3, 1895, is as follows: "Bo't of J. L. Carter 50,000 pine boards, 25 % to be hard pine and 75 % white pine, all good quality, at $9 per thousand, delivered on our wharf." He also testifies explicitly that he was advised by the manager of his company on or before June 17, "that the boards in controversy were to be attached by a creditor of the Carters," and states that it was the absolute and clear intention of the parties that the title to the boards to the amount of the 100,000 mentioned in the agreement, should pass to the Cooperage Company.

The practical result of these elaborate transactions was that immediately after the service of the writ on the trustee, the Carters actually delivered at the mill of the Cooperage Company, in Portland, 50,318 feet of the boards in question, and received in payment the sum of $100 advanced May 10 before the service of the writ and three other sums paid after the service on the trustee, viz: $200, June 22; $100 September 26, and $19.28 October 4, 1895.

Under the circumstances it is not questioned that the boards in controversy must be regarded as "entrusted" to the Cooperage Company, so as to render the company chargeable for the price of the 50,318 feet less the advance payment of $100; but it is claimed that the contract of June 17 was a completed sale of a definite number of boards at an agreed price, and that payment in full was made before the service of the writ by the negotiable promissory note of the trustee.

It is the opinion of the court, however, that this contention of payment by virtue of the note for $1000 cannot be sustained.

It is provided by R. S., chap. 86, § 55, that no person shall be adjudged trustee by reason of any negotiable note made by him. But it is confidently replied by the assignees that although negotiable in form, the note for $1000 in question was effectually controlled, and practically divested of all negotiability by the agreement in writing which accompanied its deposit with Mr. Bancroft; and furthermore that all the facts and circumstances attending the transaction satisfactorily show that the note was never intended as payment and never operated as payment of the price of any definite amount of lumber purchased.

It has been seen that at the time of the service of the writ, June 21st, the only absolute and unconditional contract subsisting between the parties was for the purchase of 50,000 feet of boards. The Cooperage Company was under no legal obligations to accept more than that. The amount which would be required in its business was then undetermined and uncertain; but it seems never to have been anticipated that more than 100,000 would be needed. Yet the note for $1000, together with the $100 advanced May 10, would be sufficient to pay for 122,000 feet at $9 per thousand. Under these circumstances the company obviously deemed it hazardous to give to persons in the financial condition of the Carters, a negotiable note for $1000, which could be put into circulation. It was, therefore, prudently arranged as a part of the same transaction to have the note deposited with a third person; and a formal written agreement signed by the parties declared that they "will and do deposit the said note of the said Cooperage Company in the hands

of Charles O. Bancroft of said Portland to be held by him, said Bancroft in trust, to be delivered to them, the said Carters when he, said Bancroft, shall be notified by C. D. Merrill or other proper officer of said company that the contract of said Carters in respect to hauling said lumber and otherwise, has been complied with." Thus the note was effectually retained within the control of the company. The fact that the note was passed into the hands of one of the Carters and by him delivered to Mr. Bancroft is immaterial. The law has regard to the substance rather than the form of such a transaction. It is manifest that by the formal act of passing the note to Mr. Carter the Cooperage Company did not intend to relinquish all control over it, for Carter immediately deposited it with Bancroft, and this was obviously done as a part of the same transaction, in pursuance of the written agreement which was executed before the delivery to Mr. Carter and deposited with the note.

It is a familiar rule that, as between parties and those having actual notice, a negotiable instrument may be construed with reference to a contemporaneous written agreement between the same parties relating to the same matter; and it is immaterial that such agreement is written on a separate paper, provided the two appear to be connected by the terms of the agreement. *Rogers* v. *Smith*, 47 N. Y. 324; *Davlin* v. *Hill*, 11 Maine, 434; 1 Daniel on Neg. Inst. 81 (a).

In *Stone* v. *Dean*, 5 N. H. 502, it was recognized as an established rule in that state, prior to the enactment of a statute on the subject, that the maker of a negotiable note could not be charged as trustee of the payee while the note was still current. But while announcing this general doctrine, the court charged the trustee in that case and say: "When the process was served upon the trustee, he had the notes he had given in his own hands, and under his own control, and those notes could not be transferred to any other person in the ordinary course of business while he thus held them, nor can he be held to pay them again if he shall be charged in this suit on that account. The reasons on which the rule is founded do not appear to exist in this case."

Again, it is plain that the note for $1000 in question was not intended by the maker or accepted by the payee as payment and satisfaction of any known debt.   The amount did not correspond with the price of any definite quantity of boards that had been mentioned in the agreement of the parties.   The payments actually made by the Cooperage Company for the lumber purchased appear to have been made without any regard to this note, or the depositary, Mr. Bancroft.   No mention of any indorsements of such payments on this note, can be found either in the disclosure of the trustee or the testimony of the president of the company.   It was rigorously excluded from circulation, and was never intended to be used in the ordinary course of business.

It is the opinion of the court that this transaction did not relieve the trustee from liability to be charged for the amount due for the 50,318 feet of boards actually received by the company, less the advance payment of $100.   The trustee is not charged "by reason of a negotiable note made by the company," but by reason of an indebtedness for lumber existing at the date of the service of the trustee process.

*Trustee charged.*